## CLINE v. JAMES et al.

### (Circuit Court of Appeals, Ninth Circuit.   May 6, 1901.)

### No. 623.

CONTRACTS—PARTIES BOUND.

    A part owner of mining claims, whose interest was not of record, but who assented to the bonding of the same by the record owner, has no standing in equity to repudiate a conveyance of his interest by his co-owner in accordance with the terms of the bond, on the ground of a private agreement between them that such conveyance would not be made unless the purchaser also took certain other claims bonded separately.

Appeal from the Circuit Court of the United States for the District of Oregon.

For opinion below, see 101 Fed. 737.

L. B. Cox, for appellant.

W. E. F. Deal, Edmond Tauszky, and Dolph, Mallory, Simon & Gearin, for appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge.   This was a suit to establish the complainant's alleged title to an undivided three-eighths interest in the Gold Bug lode mining claim, and an undivided one-half interest in the Oversight lode mining claim, both of which are situated in the Wolf Creek mining district, Josephine county, Or., and to secure an accounting by the defendants of the ore taken therefrom.   The legal title to the mines is confessedly in the defendant Gold Bug Consolidated Gold-Mining Company, by virtue of a conveyance thereof made on February 10, 1899, by the defendant W. S. James, who derived title from one R. A. Jones and wife on the 19th day of July, 1898. The court below in its opinion expressed a doubt whether the complainant ever had any interest in these two mines.   We think, however, that the evidence shows that he was jointly interested in them with R. A. Jones, but we are of the opinion that the judgment of the court below is right upon the first ground stated in its opinion. It is undisputed that the complainant and R. A. Jones were jointly interested in a certain group of mines called the "Albany Group," in the immediate vicinity of which is the Oversight mine.   That group comprised the "Albany," "C. B.," "Morning Glory," "Sunset," "Utica," "Arthur C.," "California," and "Virginia" claims, some of which stood upon the records in the name of the complainant, and some in the name of R. A. Jones.   The Oversight was located in the name of the wife of R. A. Jones, to whom and for which she afterwards executed a deed.   The Gold Bug mine was acquired by and in the name of R. A. Jones by deed from one Lee, for the joint benefit, as we think the evidence shows, of himself and the complainant. The record title, therefore, to both the Gold Bug and the Oversight stood in the name of R. A. Jones, and of this fact the complainant was well aware, according to his own testimony.   Indeed, it appears from his own testimony that R. A. Jones was given the management and control of all of the claims in which they were jointly

interested. Jones wrote to the complainant frequently in respect to the claims, and the complainant himself went to them from time to time, occasionally spending considerable time there. In 1897 the complainant and R. A. Jones were desirous of selling all of the claims mentioned, and the defendant James went from Gold Hill, Nev., to look at them. The result was that on the 19th day of June, 1897, R. A. Jones and the complainant gave James a working bond on the Albany group for $25,000, to expire September 19, 1898. That bond was sent by Jones to the complainant for his signature, and it was affixed. In returning the bond to R. A. Jones with his signature affixed, the complainant states in his testimony that he wrote to Jones asking how it was that the Oversight claim was not included, and he says Jones replied by letter that he intended to put the Oversight with the Gold Bug mine, and bond them together to James for $7,000. As a matter of fact, R. A. Jones did give James a working bond covering the Oversight and Gold Bug, by which he agreed to convey the Gold Bug to James for $6,999, and the Oversight for $1, on or before September 19, 1898, subject to the conditions stated in the bond. That the complainant was fully aware of this, and consented thereto, clearly appears from the evidence, and, indeed, from his own testimony. In speaking of the bond of the Albany group, the complainant in his testimony said:

"The bond was made for $25,000. $11,500 was to be paid to me, $1,000 to Northcutt, and the residue to R. A. Jones. Now, he comes to bond the Oversight and the Gold Bug. Now, the Oversight lays right in among,—as you understand from my testimony,—lays right in among the Albany group. The Gold Bug lays away over beyond the mountain, probably half a mile,—something like that, maybe ¾,—from the Oversight mine. So he bonds the Gold Bug for $6,999, and the Oversight for $1. We let it stand at that. The bond expired on the 19th of July."

Some question having subsequently arisen between complainant's counsel and the court in respect to the testimony of the complainant in regard to that matter, the witness answered:

"Well, I was here [in Portland] and he was there, and we were corresponding back and forth relating to the deal, and I cannot think of anything more than I have said; that is, any more than he wrote me a letter, and told me that he could bond the Oversight and the Albany group for $25,000. And when he come to make the bond—when he made the bond—he left the Oversight out, and I asked him why he did that, and he says: 'I will put that with the Gold Bug, and then I won't let them have one group without taking the two.' My understanding with him first was that the Oversight, of course, was to come in with the $25,000 group, but he so made the bond. When he sent it down here for me to sign, I noticed the Oversight wasn't in it, and I wrote him regarding it. He said: 'I put the Oversight along with the Gold Bug for $7,000, and I won't let them take one group without the two, to make a lump sale of it.'"

The trial court then asked:

"Was this in the correspondence? A. Yes, sir; I think that is in the correspondence. Q. That is in Jones' letter. I was going to ask where your letter is you say you wrote him. Have you any copy of your letter? A. No, sir; I have no copy of my letter."

A very large number of letters between these parties were introduced in evidence, but in none of them is there anything said about any agreement that the Oversight and Gold Bug should not be sold

unless the Albany group was. Of these the court below correctly said in its opinion:

"These letters cover a period of time from the 1st of January, 1896, to October 26, 1898. The frequency of this correspondence is shown by the fact that a large number of letters were sent by Jones to the plaintiff almost every month during this period. To illustrate, the defendant Jones wrote during the month of June, 1897, to the plaintiff on the 3d, 5th, 6th, 9th, 16th, 22d, and 29th of the month. During the other months these letters were less frequent, but still they were quite as numerous, considering the nature of the business to which they relate, as could have been expected from the most painstaking business associate to his partner. It is a suggestive fact that in all this volume of correspondence the particular letter or letters in which the plaintiff avers that Jones told him that he would not let the purchaser take one group without taking the two are not to be found. In these letters the same subjects are referred to over and over again, with reference to all these properties. The different mining properties—those which are admitted to be the joint property of the parties, as well as those which are claimed by Jones to have been his separate property—are constantly mentioned. It is incredible that this volume of letters, filled with details of the business in which these parties were concerned, should nowhere make mention of such an agreement as plaintiff now bases his right upon. It is likely that there would have been more than one letter containing some reference to such an agreement, if it had existed. There is nowhere any discernible break in the correspondence, no place that indicates a missing letter, nor is any explanation offered of the fact that, in all this book of letters, the only one bearing upon the fact in issue should be missing. The plaintiff has evidently preserved this correspondence with great care. Towards the latter part of the correspondence there are indications of impending disagreements between the parties, and the correspondence shows that Jones regarded the Gold Bug mine as his individual property. This occurred long before the expiration of the bond and the sale to James. Under these circumstances, it is hardly possible that the plaintiff, who has preserved so many of these letters, would have neglected such correspondence as contained the agreement which he now testifies to, especially in view of the fact that such an agreement would have been conclusive of his title to an interest in the Gold Bug mine."

Conceding it be true, as testified to by complainant, that there was an agreement between him and R. A. Jones that Jones should not sell the Oversight and Gold Bug claims unless the purchaser also took the Albany group, still it is not pretended that James, who was the purchaser of the mines in question, had any notice whatever of any such agreement, and, as has been said, it is perfectly clear from the evidence in the case that the complainant knew that the title to the Oversight and Gold Bug claims stood of record in the name of R. A. Jones, and that the complainant consented that Jones should bond them to James, which he did. Under such circumstances, we can see no valid ground for permitting the complainant to impeach the conveyance of those claims pursuant to the provisions of the bond. McGahan v. Bank, 156 U. S. 232, 15 Sup. Ct. 347, 39 L. Ed. 403; Thompson v. Bowman, 6 Wall. 318, 18 L. Ed. 736; Young v. Wheeler (C. C.) 34 Fed. 99; Van Brunt v. Applegate, 44 N. Y. 544; Cox v. McBurney, 2 Sandf. 566; Chester v. Dickerson, 54 N. Y. 10, 13 Am. Rep. 550; Greer v. Ferguson, 56 Ark. 324, 19 S. W. 966; Wilson v. Hunter, 14 Wis. 686. The judgment is affirmed.